## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 15-23425-Civ-COOKE/TORRES

LESLIE REILLY, an individual,
on behalf of herself and all others
similarly situated,

      Plaintiff,

v.

CHIPOTLE MEXICAN GRILL, INC., a
Delaware corporation,

      Defendant.

_____/

## <u>DEFENDANT CHIPOTLE MEXICAN GRILL'S MOTION TO EXCLUDE THE EXPERT WITNESS TESTIMONY OF PATRICK ANDERSON</u>

I.    **INTRODUCTION**

Plaintiff's expert, Patrick Anderson, offers two models by which he purports to calculate classwide damages - the "Price Premium Model" and the "Disgorged Profits Model."   Neither model is admissible because each consists of nothing more than speculative, irrelevant calculations, untethered to sufficient data or a reliable methodology.

The Price Premium Model purports to measure a price premium paid to Chipotle by consumers for foods represented as made with only non-GMO ingredients when the meat and dairy came from animals that may have consumed genetically modified feed.   However, Mr. Anderson's model does not rely on the prices Chipotle – or any of its competitors -- actually charged in Florida during the relevant time period.   Instead, Mr. Anderson cherry-picked 24 prepackaged and meat products sold at grocery stores in Chicago, Illinois, in June 2016, and compared the prices of one such conventional product to one labeled as "non-GMO."   He did so without ensuring that the products were otherwise identical except for their non-GMO status.   The products chosen, most of which Chipotle does not use or serve, varied from mayonnaise to almond milk to cereal bars.   The so-called price premium for the selected prepackaged grocery store non-GMO products varied from 7% to 135%, with an average of 61%.   The so-called price premium for selected non-GMO meat products varied from 6% to 60%, with an average of 32%. Based on these figures, without relying on any scientific method, but using only his "professional judgment," Mr. Anderson picked 20% as the starting point for his analysis to determine the price premium Chipotle allegedly charged for its non-GMO foods.   Despite the broad range of price premiums of the grocery store items he considered, Mr. Anderson does not disclose a known error rate.   For these reasons, the entire premise of Mr. Anderson's Price Premium Model – i.e., the purported 20% premium – is flawed and the remaining steps of his analysis fare no better, proving that there is no relationship between the data and methods Mr. Anderson used and any purported price premium allegedly paid by any putative class member.

Even if Mr. Anderson's data, method and analysis were adequate to satisfy Federal Rule of Evidence 702, his models are not relevant or helpful because they do not purport to measure damages under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").   Under FDUTPA, actual damages are "the difference in the market value of the product or service in the condition in which it was delivered and its market value in the

condition in which it should have been delivered….” *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006).  His Price Premium Model does not even attempt to measure the market value of Chipotle's food, either "as delivered" or as "non-GMO," nor does it attempt to measure the difference between the two.  For these reasons, the Price Premium Model should be excluded.

Plaintiff offers Mr. Anderson's Disgorged Profits Model as the purported measure of damages under her unjust enrichment claim.  The flaws in this model are evidenced most clearly by the fact that Mr. Anderson does not follow his own proposed methodology.  Though he states that he intends to measure the incremental profits that Chipotle earned as a result of the "non-GMO pledge," he does no such thing.  He does not measure the incremental profits after the date of the "non-GMO pledge" (which began with the April 27, 2015 announcement), but rather simply measures incremental profits in *all of 2015* compared to 2014.  In addition, Mr. Anderson wholly ignores, and does not account for, any other potential cause of Chipotle's increased profits. Rather, he simply assumes that 100% of the increased profits that Chipotle recognized in 2015 are entirely attributable to the announcement of its move to only non-GMO ingredients.  This is a particularly egregious omission since Mr. Anderson discusses the alternate causes of Chipotle's profit growth in his report and readily admits they exist.  For example, Mr. Anderson acknowledges that Chipotle increased the number of restaurants in Florida during the same period, that Chipotle has steadily been growing for the last five years and that Chipotle is a popular fast casual restaurant: "*They're a hot company within a hot segment and they're growing*."  Adding to these flaws is that Mr. Anderson mixes his mathematical calculations mid-way through his model, rendering it internally inconsistent and speculative.  It simply does not meet the standards of Federal Rule of Evidence 702.

Undeniably, the Disgorged Profits Model does nothing more than calculate a measure of incremental profits earned in 2015 compared to 2014.  This measure of profits is neither helpful nor relevant to ascertaining how much benefit the putative class allegedly has conferred on Chipotle that Chipotle has allegedly unjustly retained.  It is therefore neither relevant nor helpful to the trier of fact deciding the unjust enrichment claim.  Accordingly, the Disgorged Profits Model should also be excluded from trial.

## II.   <u>STANDARD FOR EXPERT TESTIMONY</u>

Federal Rule of Evidence 702 specifies that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)     the testimony is based on sufficient facts or data;

(c)     the testimony is the product of reliable principles and methods; and

(d)     the expert has reliably applied the principles and methods to the facts of the case."

Fed. R. Evid. 702.

Plaintiff – as the proponent of Mr. Anderson -- has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.  *Rink v. Cheminova, Inc.,* 400 F.3d 1286, 1291-92 (11th Cir. 2005).

The admissibility of expert testimony is a question for the district court.  Fed. R. Evid. 104(a); *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987).

With respect to expert testimony, the Supreme Court has recognized the obligation of the district court to fill a "gatekeeping role" to ensure that the testimony is "not only relevant, but reliable."   *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589, 597 (1993) (emphasis added); *Rink,* 400 F.3d at 1291 ("Under Rule 702 and *Daubert,* district courts must act as 'gatekeepers' which admit expert testimony only if it is both reliable and relevant.").

The non-exclusive factors to consider include (1) whether the expert's technique or theory can be or has been tested; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community. *Daubert,* 509 U.S. at 593-94; *Rink,* 400 F.3d at 1291.

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the

expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *GE v. Joiner*, 522 U.S. 136, 146 (1997).

Courts have deemed experts unreliable where their opinions have not been tested, they have not presented evidence of the known or potential error rate of their theories, and their opinions do not enjoy general acceptance in the relevant scientific community. *Benkwith v. Matrixx Initiatives, Inc.*, 467 F. Supp. 2d 1316, 1330-1331 (M.D. Ala. 2006); *see also Sumner v. Biomet, Inc.*, 434 Fed. Appx. 834, 842 (11th Cir. 2011) (excluding expert as unreliable where there were no prior studies documenting opinion and no known rate of error as the theory had yet to be tested or documented); *United States v. Marks*, 2013 U.S. Dist. LEXIS 120177, *10-11 (S.D. Fla. Aug. 13, 2013) (magistrate judge recommending exclusion of expert opinion where expert had not provided tests of his conclusions, known or potential rate of error, standards controlling his theories, or general acceptance of his opinions); *United States v. Marks*, 2013 U.S. Dist. LEXIS 120181 (S.D. Fla. Aug. 22, 2013) (adopting magistrate judge's recommendation); *Kilpatrick v. Breg, Inc.*, 2009 U.S. Dist. LEXIS 76128, *25-26 (S.D. Fla. June 25, 2009) (excluding expert's opinion as unreliable where his extrapolation of studies upon which he relied were not warranted, his methodology had no known rate of error, and his opinion was, at most, "merely plausible, not proven"); *City of Mt. Park v. Lakeside at Ansley, LLC*, 2009 U.S. Dist. LEXIS 131001, *24-26 (N.D. Ga. Jan. 6, 2009) (expert's penalty matrix analysis unreliable where validity of results could not be tested, there was no known error rate, and the matrix had not been peer reviewed or accepted by the scientific community); *Pb Prop. Mgmt. v. Goodman Mfg. Co., L.P.*, 2016 U.S. Dist. LEXIS 97520, *48-50 (M.D. Fla. May 12, 2016) (excluding expert opinion where assumptions required to form expert's opinion were unsupported by any available evidence, expert provided no explanation apart from experience in industry to support the assumptions necessary to reach his conclusion).

## III.   **MR. ANDERSON'S PRICE PREMIUM DAMAGES MODEL SHOULD BE EXCLUDED.**

### A.   **Summary of the Price Premium Model's Data and Methodology.**

Below is a copy of Mr. Anderson's Price Premium calculation from Exhibit E-1 of his June 24, 2016 Report, and a summary of each step follows:

| Chipotle Market Research & AEG Estimates of Premium, Adjusted |
| --- |
| 20.0% |
| 0.58 |
| 11.6% |
| 0.55 |
| 6.4% |

(June 24, 2016 Report, Exh. E-1[Henry Decl., Exh. B].)

**Step 1: 20.0% Consumer Price Premium on non-GMO Food.**  Mr. Anderson's Price Premium begins with a 20% "Consumer Price Premium on non-GMO Food."  In Mr. Anderson's own words: "The 20 percent comes from our assessment, our own price premium survey that we did where we went and conducted, you know, did price surveys in grocery stores here in Chicago, adjusted for menu items, the proportion of the menu item that would be covered by these particular ingredients."  (Anderson Tr., p. 95:12–19 [Henry Decl., Exh. C].)  His survey consisted of selecting 24 different grocery store products identified as "conventional" and "non-GMO" and comparing the prices.  (June 24 Report, B-7 [Henry Decl., Exh. B].)  The price differences varied from as low as 6% (the price difference between conventional chicken breast at Mariano's grocery store compared to non-GMO at Whole Foods) to 135% (the price difference between conventional ketchup and non-GMO ketchup at a grocery store).  (*Id.*)  Mr. Anderson relied on a hodgepodge of different products that have no relationship to Chipotle and are not among the foods served by Chipotle, other than chicken and rice: tuna, mayonnaise, salsa, almond milk, eggs, chocolate chips, granola, ketchup, oatmeal, strawberry cereal bars, macaroni and cheese and waffles.  (*Id.*)  The prices were from three different grocery stores in Chicago, Illinois, in June 2016.  (Anderson Tr., Exh. 7, Tab 50 – Price Survey Memo, p. 1 [Henry Decl., Exh. D].)  The price premium was calculated on a per-item basis by comparing a *single* conventional item against a *single* non-GMO item.  (*Id.*)  Though the surveyor took 200 photographs, she used only 48 photographs of them for the price study.  (Anderson Tr., pp.

246:25–248:4; Exh. 7, Tab 50 – Price Survey Memo, p. 1 [Henry Decl., Exhs. C&D].)
Dividing the grocery items into two groups, Mr. Anderson then calculated the average price
difference — 32% for meat items and 61% for packaged products. (Anderson Tr., pp. 95:24-
96:24 [Henry Decl., Exh. C].)  From those two averages, he simply decided to use 20% as a
"consumer price premium."  (*Id.* at pp. 96:25-97:5.)  When asked why he chose 20% as the
consumer price premium on non-GMO food, he stated:

> The application we had there of 20 percent, we had 32 percent and 61 percent
> price premium for observed commodities.  When I say commodities here, I'm
> using it in the term that you can buy it in specific sizes, et cetera, in grocery
> stores.  The restaurant here you're not getting just that, you're getting some
> preparation and everything.  So the appropriate price premium that goes in
> would be a smaller number than that.  So we used 20 percent, not 30 percent,
> not 60 percent.

(*Id.* at pp. 97:12-98: 3.)  When asked if he could have used a 25 percent instead of 20
percent, Mr. Anderson said "it wouldn't have been outside the range of a plausible value."
(*Id.* at pp. 99:10-100:15.)  When asked, "what about 30 percent?," Mr. Anderson said he
"would have a hard time myself going above 30 percent."  (*Id.* at pp. 100:17-101:14.)
Similarly, "15 percent would be plausible."  (*Id.* at p. 101:15-18.)  When asked about 10
percent, Mr. Anderson testified, "I would be reluctant to go below 10 if I'm going to put
something on there as I just think it's not — the market research is clear that people are —
they'll pay a premium, a significant number will, and we're observing them on commodities
often a hundred percent price premium.  So when they get to a restaurant, I mean, I think
10 percent is the lowest plausible indication."  (*Id.* at pp. 101:19-102:2.)

**Step 2: 58% Applied to Price Premium to Account for "Unconcerned Buyers."**
After randomly choosing a 20% price premium, Mr. Anderson discounted that premium to
take "into account the buyers that were unconcerned and the buyers that were concerned,
the mix between the two, that's the 58 percent." (Anderson Tr., pp. 98:4-99:8 [Henry Decl.,
Exh. C].)  He based this calculation on an online survey conducted by Chipotle in
January 2015 which asked 1,251 consumers two questions.

(1)    Do you avoid buying or eating GMO's?

> (2)    If a restaurant announced it was serving food with GMO's, it would make me: [choose answer].

Mr. Anderson characterized the responses to the first question as 59% of "Consumers avoid buying GMO food" when they answered that they avoid buying or eating GMO's "all of the time," "whenever possible" or "sometimes, when it is convenient." (Murrin Tr., Exh. 5, p. 345; June 17, 2016 Report, Exh. B-6; Anderson Tr., pp. 89:23-90:23 [Henry Decl., Exhs. E, A&C, respectively].)  He characterized the responses to the second question as 58% of consumers are "less likely" to go to a restaurant serving GMO food, when they answered they were "somewhat less likely to go" or "much less likely to go."  (Murrin, Exh. 5, p. 347, June 17, 2016 Report Exh. B-6, Anderson Tr., pp. 87:2-88:14 [Henry Decl., Exhs. E, A&C, respectively].)

**Step 3: 55% Applied to Price Premium to Account for Restaurants.**  Next, Mr. Anderson discounted the price premium further, by 45%, to account for the Chipotle being a fast casual restaurant.  (Anderson Tr., p. 110:4-12 [Henry Decl., Exh. D].)  He explains:

> [T]his is in a fast casual restaurant segment, and I felt we needed to adjust it down for the fact that they're doing a price premium of a fast casual restaurant where you're buying the whole thing.  Again, you're buying the whole burrito, the whole enchilada.  When you go in the door, everything you buy is at the menu prices.  So I reduced it down further in that one to get some indication of what would be the translation of the 11 percent there price premium for covered menu items to what they could get away with, what they could get away with on the covered menu items in a competitive market.

(*Id.* at pp. 109:3-110:3.)  Inexplicably, he discounts the price premium even though his choice of a 20% price premium supposedly was to address applying his observed grocery store price premiums to a restaurant.  Doing this calculation, Mr. Anderson arrived at a 6.4% "Non-GMO Price Premium."

Mr. Anderson then calculates 6.4% of the total sales in Florida of covered items to arrive at estimated classwide damages.  (June 24, 2016 Report, Exh. E-2 [Henry Decl., Exh. B].)

Though his notes state that he based the 6.4% price premium on "survey data from academic, independent and Chipotle sources," and that it was "adjusted for probable

-8-

overstatement by respondents," (June 24, 2016 Report, Exh. E-2, n. 3), that note is false. His Non-GMO Price Premium is based on his company's incomplete, *ad hoc* grocery store price survey of unrelated packaged foods (20%), reduced to attempt to account for purchasers who do not care about GMO status using Chipotle's survey (58%) and then reduced again by a third factor (55%) to account for the fact that he is using grocery store data for restaurant prices. None of those is academic, none accounts for overstatements by survey respondents, and none is relevant to how much, if any, price premium Chipotle customers paid.

Mr. Anderson nevertheless purports to validate his unfounded figures by performing a "reasonableness check" and a "sensitivity analysis," but these just demonstrate how unscientific his method is. As a reasonableness check, he took the total price premium allegedly paid by all Florida consumers and divided it by the total number of covered items sold in Florida, which results in "about 39 cents an item." Without comparing it to any benchmark, he reasoned: "would you as a consumer if you were concerned about GMO foods would you, you know, would you pay 39 cents more for your burrito that cost you $7 or $8? *That seems entirely reasonable*." (Anderson Tr., pp. 164:10–165:12 [Henry Decl., Exh. C]) (emphasis added). Mr. Anderson's grocery survey data suggest a very large error rate because the price premium for meat products range from 6% to 60% and the price premium for non-GMO prepackaged products range from 7% to 135%. Instead of using this survey data for a "sensitivity analysis," he simply purports to calculate the lower and upper bound on total classwide price premium using other price premiums of 5% and 6.6%. (June 24, 2016 Report, Exh. E-2 [Henry Decl., Exh. B].) Of course, his 6.4% calculation falls within that range.

> **B.    For His Price Premium Model, Mr. Anderson Fails To Use Sufficient Data, And The Model Is Not The Product Of Reliable Principles And Methods That Have Been Reliably Applied.**

The starting point of the Price Premium Model – the 20% price premium of non-GMO foods – is based on insufficient data, rendering the entire calculation that follows unreliable. As an initial matter, the underlying grocery price survey data on which the purported premium is based itself is nothing more than an irrelevant sampling of prices that have no bearing on Chipotle products or how Chipotle does business. The survey data:

- Are from a different geographic market – Chicago instead of Florida.
- Cover two dates in June 2016 instead of the alleged class period – April 27, 2015 to the present.
- Are prices from three different grocery stores – Whole Foods, Mariano's and Jewell/Osco – instead of Chipotle (or any restaurant).
- Include products unrelated to Chipotle's ingredients, such as mayonnaise, frozen breakfasts, oatmeal and cereal bars.
- Were selected from unknown other products based on undisclosed criteria, without explanation other than being based on "some limited amount of judgment."   (Anderson Tr, pp. 246:25-248:4 [Henry Decl., Exh. C].)
- Were compared without any assurance that they are identical except for their GMO/non-GMO status.

Without any principle or method, Mr. Anderson decided to use 20% as the Price Premium, even though it is lower than the averages price premiums he purports to have observed.  If there were any doubt that he simply picked 20% without any scientific method, his admissions that that 10%, 15% and 30% were "plausible" proves it.

Mr. Anderson's next two steps further demonstrate that he is attempting to apply a method of calculating damages that is not based on any reliable principle or method. Specifically, Mr. Anderson reduces the price premium to supposedly account for the percentage of customers who are unconcerned with the GMO status of foods by multiplying the 20% Price Premium by 58%.  He does not explain how this results in an accurate estimation of *how much* price premium consumers actually paid.  Next, he further reduces the price premium by multiplying it by 55%, claiming that he does so because his price premium is based on grocery store prices and he is applying them to fast casual restaurants. Yet he provides no source or rationale for how or why he picked 55%.  He provides no "academic or independent" sources for this methodology or an explanation as to why he used 55% instead of another number.

Mr. Anderson's reason for relying on Chicago grocery store prices for a small sampling of unrelated food items rather than on any price premium Chipotle actually charged is not surprising.  As he readily concedes, Chipotle did not increase its prices as a

result of its non-GMO announcement. (Anderson Tr., pp. 178:4-181:4 [Henry Decl., Exh. C].) Leslie Reilly, the named plaintiff, proves the point; she paid the same price for her Chipotle items before the non-GMO announcement as after. (Plaintiff's Bank Statements; Plaintiff Tr., pp. 40:1-21; 42:17-20; 46:9-16 & 46:24-47:5 [Henry Decl., Exhs. F&C, respectively].) Mr. Anderson could not answer how much price premium Ms. Reilly paid to Chipotle; he has not estimated her damages in this case; nor did he have an opinion as to how much money she should be compensated in this case. (Anderson Tr., pp. 257:9–258:17 [Henry Decl., Exh. C].)

Mr. Anderson begins with irrelevant data, and then proceeds to reach a price premium without any known method or in any principled manner. Mr. Anderson has not presented evidence of the known or potential error rate of his Price Premium Model, nor has he presented evidence that his method is generally accepted. His Price Premium Model should be excluded.

**C.**     **Mr. Anderson's Price Premium Model Should Be Excluded Because It Does Not Measure The Damages Available Under FDUTPA.**

Under FDUTPA, "actual damages" are "the difference in the market value of the product or service in the condition which it was delivered and its market value in the condition in which it should have been delivered…." *Butland*, 951 So. 2d at 869; *see also PODS Enters., LLC v. U-Haul Int'l, Inc.*, 126 F. Supp. 3d 1263, 1286 (M.D. Fla. 2015); *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942, 992-993 (S.D. Cal. 2014) (discussing Florida law); *Stires v. Carnival Corp.*, 243 F. Supp. 2d 1313, 1322 (M.D. Fla. 2002); *Solarblue v. Trebor Power Sys.*, 2013 Fla. Cir. LEXIS 2692, *4-9 (Fla. 9th Cir. Ct. Aug. 22, 2013) (noting that the actual damages standard under FDUTPA is "synonymous with benefit of the bargain damages" and collecting cases). "Actual damages" do not include consequential damages or diminution in value. *Butland,* 951 So. 2d at 869-70.

There are a couple of noted exceptions, though neither one applies here. First, when a product is "rendered valueless as a result of the defect-then the purchase price is the appropriate measure of actual damages." *Butland*, 951 So. 2d at 869-70; *see also Stires*, 243 F. Supp. 2d at 1322; *Democratic Republic of the Congo v. Air Capital Group, LLC*, 614 Fed. Appx. 460, 472-473 (11th Cir. 2015) (discussing examples, and finding case fell into exception).

Second, when a company represents that it is charging a "pass through" fee that is to be passed through to another entity, but instead keeps part of the funds for itself, the full amount of fees would be the appropriate measure. *Bowe v. Public Storage*, 106 F. Supp. 3d 1252, 1269-1270 (S.D. Fla. 2015).

As described above, Mr. Anderson's Price Premium Model – title notwithstanding – does not measure any price premium Chipotle charged.  Instead, Mr. Anderson has attempted to identify a non-GMO price premium charged by Chicago grocery stores on unrelated grocery items, and using that data, reduce it to somehow make it applicable to Chipotle.

Moreover, Mr. Anderson's models do not measure the "difference in the market value of the product or service in the condition which it was delivered and its market value in the condition in which it should have been delivered…."  *Butland,* 951 So. 2d at 869. When asked whether he determined the market value of a Chipotle chicken burrito labeled as non-GMO (what Ms. Reilly purchased), Mr. Anderson responded:

> To the extent we have information on the market value of chicken burritos, we have the following.  We have the prices that are charged in Chipotle restaurants embedded in the average bill over time because those are prices they were actually charging.  We know that the average check was going up during this time period, we know that they increased their prices, we know that their profits grew because of the price increase by their own decomposition. That's all information we know that reflects market prices of products, and all of those observations are of large numbers of transactions together, and even the most, I don't want to say granular, but the most narrow of that is averages across millions of consumers of what an average check is. So that's what information we have.  ***None of that is a separate analysis of a non-GMO and a GMO chicken burrito.***

(Anderson Tr., pp. 253:22–254:18 [Henry Decl., Exh. C].)(emphasis supplied).

Because Mr. Anderson's Price Premium Model does not measure the "difference in the market value of the product or service in the condition which it was delivered and its market value in the condition in which it should have been delivered" (*Butland*, 951 So. 2d at 869), it is not relevant or helpful to the trier of fact and should be excluded. *Gastaldi v.*

*Sunvest Resort Communities*, *LC*, 709 F.Supp.2d 1299, 1304-06 (S.D. Fla. 2010) (excluding expert opinion as to damages because the model was neither reliable nor relevant as it did not measure damages under FDUTPA).

## IV.   MR. ANDERSON'S DISGORGED PROFITS MODEL SHOULD BE EXCLUDED.

### A.   Summary of the Disgorged Profits Model's Data and Methodology.

According to Plaintiff, she offers Mr. Anderson's Disgorged Profits Model for her unjust enrichment claim.  (D.E. 109, Reply in Support of Motion for Class Certification, p. 7.)  Mr. Anderson describes the model as "an indirect measure" of estimating consumer damages.  (June 24, 2016 Report, p. 20, ¶ 45 [Henry Decl., Exh. B].)  For this model, he describes the methodology as starting with identifying the "cause or alleged cause of a changed in business condition."  (*Id.* at ¶ 50(a).)  In this case, Mr. Anderson opines that would be the "non-GMO pledge" on April 27, 2015, and the information that followed. (Anderson Tr., pp. 215:9–216:1 [Henry Decl., Exh. C].)  The next step in the methodology involves "Modeling the change in sales revenue arising from that causal event, which involves projecting forward the sales revenue that actually occurred, and comparing it with what would have occurred 'but for' the breach or other event.  The result is incremental sales revenue."  (June 24, 2016 Report, ¶ 50 (b) [Henry Decl., Exh. B].)

Below is a copy of Mr. Anderson's Disgorged Profit Method calculation from Exhibit E-3 of his report, and a summary of each step follows:

| Exhibit E-3. Consumer Damages Estimate, Disgorged Profit Method, 2015 | | | | | |
|---|---|---|---|---|---|
| | | **Actual** | | *Average Share of Revenue* | **Incremental** |
| | | **2014** | **2015** | | **2015 over 2014** |
| Revenue | (1) | $4,108,269,000 | $4,501,223,000 | | $ 392,954,000 |
| Food, Beverage, and Packaging Costs | (2) | 1,420,994,000 | 1,503,835,000 | *34.0%* | 133,600,640 |
| **Gross Profit** | | | | | 259,353,360 |
| *Costs associated with incremental revenue:* | | | | | |
| Labor Costs | (3) | | | 22.6% | 88,898,671 |
| Occupancy Costs | (3) | | | 5.7% | 22,495,411 |
| Portion of other operating costs | (4) | | | 5.5% | 21,622,797 |
| Total Directly Associated Costs | | | | 33.9% | 133,016,879 |
| **Incremental Profits, All Chipotle, 2015** | | | | | $ 126,336,482 |
| Florida Share of Total Revenue, 2015 | (5) | | | | 6.6% |
| **Incremental Profits, Florida, 2015** | | | | | $    8,284,902 |

([Henry Decl., Exh. B].)

**Step 1: Incremental Revenue**.  First, Mr. Anderson calculated the Incremental Revenue of $392,954,000, which is the difference between the Chipotle's total revenue in 2015 and 2014.  (Anderson Tr., p. 227:5–20 [Henry Decl., Exh. C].)

**Step 2: Deduct Average Incremental Food, Beverage and Packaging Costs**.  Second, Mr. Anderson calculated the last two years' *average* Incremental Food, Beverage and Packaging Costs. (*Id.* at pp. 227:21–228:1.)  He then deducted those average costs to arrive at "Incremental Gross Profit."  (*Id.* at p. 228:2–6.)

**Step 3:  Deduct Average Labor, Occupancy and Other Operating Costs.**  Third, Mr. Anderson deducted the last two years' *average* labor, occupancy and other operating costs of $133,016,879 to arrive at his calculation of "Incremental Profits, All Chipotle, 2015" of $126,336,482.  (*Id.* at pp. 228:7–231:18.)

**Step 4: Calculate Florida's Share of Revenue.**  Fourth, Mr. Anderson then multiplied the incremental profits for all Chipotle restaurants in 2015 by 6.6% to arrive at an amount to represent Florida's share.

B.     <u>For His Disgorged Profits Model, Mr. Anderson Fails To Use Sufficient Data, And The Model Is Not the Product Of Reliable Principles And Methods That Have Been Reliably Applied.</u>

Mr. Anderson's Disgorged Profits Model purports to be an indirect method of measuring consumer damages by comparing the actual sales revenue to a projection of the sales revenue "but for" the breach or other event.  In other words, his methodology should compare Chipotle's actual sales revenues to a projection of what Chipotle's sales would have been "but for" its non-GMO representations.  (June 24, 2016 Report, p. 22, ¶ 50(b) [Henry Decl., Exh. B].)

When Mr. Anderson applied his methodology, his did not actually follow it.  He does not compare actual sales revenues to what they would have been "but for" Chipotle's non-GMO representations.  Instead, he simply compared Chipotle's nationwide 2015 sales revenues to 2014 sales revenues.  Mr. Anderson's consideration of all of Chipotle's 2015 sales revenues as potentially being part of the relevant "incremental revenue" is inappropriate.  The so-called "breach or other event" was Chipotle's "non-GMO pledge,"

which Mr. Anderson admits does not occur until April 27, 2015 – well into the second quarter of 2015.

His model also fails to account for any other reasons why Chipotle's sales revenues increased in 2015 over 2014, even though he readily acknowledges multiple reasons for Chipotle's growing sales.  For example, though he noted in Exhibit C-2 of his June 17, 2016 Report that Chipotle increased the number of its Florida restaurants from 99 in 2014 to 116 in 2015, his Disgorged Profits Model does not account for this as a reason for increased revenue.  (June 17, 2016 Report, Exh. C-2 [Henry Decl., Exh. A].)  In other portions of his report, he acknowledged that Chipotle's "total revenue has increased *steadily over the last five years.*" (*Id.*, p. 17, ¶ 71) (emphasis added).  His charts reflect steady revenue increases for Chipotle both nationwide and in Florida. (*Id.* at Exhibits C-1 and C-2.)  When asked what he attributes the steady revenue increases over the last five years, he identifies "a bunch of things," none of which is Chipotle's "non-GMO pledge":

> Number one, as I said earlier, ***this is the hottest segment, fast casual.   It's growing***.  Number two, ***Chipotle is for many people the most exciting or most notable of the fast casual restaurants***.   There are even articles that we read where people talked about what's the next Chipotle as in who is the next Bruce Springsteen or who is going to be the next Michael Jordan or something like that using an extremely successful participant in one market as the name for the next big thing, so to speak.  So Chipotle is clearly in the hot segment.  ***They're a hot company within a hot segment and they're growing***.  Their product philosophy and everything is embedded into that, their marketing material, so they've got a winning formula.  There's no two ways around it.  And we attribute the growth during that time period to ***all of those factors plus what I indicated earlier, which is the economy basically from 2009 on is recovering, so you would expect trend restaurant sales to have grown, which they also did***.  All of those factors go together to make Chipotle over this time period a very successful company.

(Anderson Tr., pp. 153:16–154:13 [Henry Decl., Exh. C].)(emphasis supplied).

Mr. Anderson readily admits that his Disgorged Profits Model is "an indirect measure," but, as applied, it is so unprincipled and indirect that it is simply an *ipse dixit*

statement of damages.  It has no relationship to the alleged false advertising in this case.  It does not measure the alleged incremental revenue beginning when the "Non-GMO pledge" was made.  It does not account for, and exclude, all the other causes for Chipotle's increased revenue – many of which Mr. Anderson readily admit existed during this time frame.  As it is nothing more than a mathematical calculation of incremental net revenue, it does not even have a known rate of error – essentially conceding this is not an expert opinion at all.  *See e.g., Sumner*, 434 Fed. Appx. at 842 (excluding expert as unreliable where there were no prior studies documenting opinion and no known rate of error as the theory had yet to be tested or documented).   Accordingly, Mr. Anderson's model is nothing more than a calculation of increased profit revenue from one year to the next with no relationship to the alleged wrongdoing here, and thus is irrelevant and inadmissible.

### C.  Mr. Anderson's Disgorged Profits Model Is Flawed Because He Mixes Mathematical Approaches to Reach a Positive Number.

As a separate ground, Mr. Anderson's Disgorged Profits Model is demonstrably flawed because he mixes his mathematical approaches to reach a positive number.

Mr. Anderson begins with *actual* revenue figures.  Instead of using the actual figures for the costs to be deducted from the revenue, Mr. Anderson used *average* data from the prior two years.  If he had deducted the *actual* costs from the revenue, then he would have obtained a negative number.  (Shugan Report, ¶ 179, Exh. V [Henry Decl., Exh. H].)

### D.  Mr. Anderson's Disgorged Profits Model Should Be Excluded Because It Does Not Measure Unjust Enrichment.

"Unjust enrichment awards are not punitive, and allowing plaintiffs a recovery worth more than the benefit conferred would result in an unwarranted windfall."  *Am. Safety Ins. Serv. v. Griggs*, 959 So. 2d 322, 332 (Fla. Dist. Ct. App. 5th Dist. 2007).

In *Prohias v. Pfizer, Inc.*, 490 F. Supp. 2d 1228, 1235-1237 (S.D. Fla. 2007), the court found that plaintiffs had failed to state a claim for unjust enrichment because they had purchased a cholesterol reducing drug and obtained cholesterol reduction (though other benefits of the drug were overstated).  The court noted that, "in a general sense" they had "obtained the benefit of their bargain."  *Id.* at 1236.  The court also noted that unjust enrichment "cannot exist where payment has been made for the benefit conferred."  *Id.*

-16-

Mr. Anderson's Disgorged Profits Model does not measure the amount that Chipotle has been unjustly enriched.  His model only calculates the incremental profits from 2015 compared to 2014.  That calculation says nothing about how much Chipotle has received from its alleged false advertising that it should not keep – nor does it say anything about how much putative class members should receive from Chipotle.

Ms. Reilly, like all other Florida consumers, paid the same amount for her identical meals at Chipotle before and after the non-GMO announcement.[1]  Thus, it would be impossible for Mr. Anderson to articulate how much Ms. Reilly – or any other member of the putative class -- unjustly enriched Chipotle.  Common sense dictates that there has been no unjust enrichment of Chipotle here, which explains Mr. Anderson's need to rely upon a number that could be calculated but that is irrelevant to the unjust enrichment analysis – i.e., 2015's incremental net profits.  The same holds true for the remaining putative class members.  Thus, Plaintiff has no proffer of a true unjust enrichment measure.

V.    **CONCLUSION**

Chipotle respectfully requests that the Court exercise its gatekeeper function, analyze Mr. Anderson's models, and prevent Mr. Anderson from confusing the jury with economic jargon and irrelevant calculations that are not based on sufficient data, a reliable method or a method reliably applied.

---

[1] Though Chipotle raised prices on items containing beef later in 2015, Mr. Anderson does not attribute that to the non-GMO pledge.  (Anderson Tr., pp. 178:4-181:4 [Henry Decl, Exh. C].)

Dated:  July 29, 2016

STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.

MESSNER REEVES, LLP

SHEPPARD, MULLIN, RICHTER &
HAMPTON, LLP


By:   */s/ Kelly R. Melchiondo*

STEARNS WEAVER MILLER
WEISSLER ALHADEFF &
SITTERSON, P.A
Carlos J. Canino, Esq.
Florida Bar No. 507172
ccanino@stearnsweaver.com
Kelly Ruane Melchiondo, Esq.
Florida Bar No. 0582603
kmelchiondo@stearnsweaver.com
Museum Tower
150 West Flagler Street
Suite 2200
Miami, FL 33130
Tel.: (305) 789-3200
Fax: (305) 789-3395

MESSNER REEVES, LLP
Charles C. Cavanagh, Esq.
(*Pro Hac Vice*)
ccavanagh@messner.com
1430 Wynkoop Street, Suite 300
Denver, CO 80202
Tel.: (303) 623-1800
Fax: (303) 623-0552

SHEPPARD, MULLIN, RICHTER &
HAMPTON, LLP
Sascha Henry, Esq.
(*Pro Hac Vice*)
shenry@sheppardmullin.com
333 South Hope Street, 43rd Floor
Los Angeles, CA 90071
Tel.: (213) 620-1780
Fax: (213) 620-1398

*Attorneys for Chipotle Mexican Grill, Inc.*

-18-

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 29, 2016, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.   I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the Service List below in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing.

By   */s/ Kelly R. Melchiondo*

Kelly R. Melchiondo

## SERVICE LIST

Lance A. Harke, P.A.
lharke@harkeclasby.com
Sarah Clasby Engel, P.A.
sengel@harkeclasby.com
Howard M. Bushman, P.A.
hbushman@harkeclasby.com
**Harke Clasby & Bushman, LLP**
9699 NE Second Avenue
Miami Shores, Florida 33138

*Attorneys for Plaintiff Leslie J. Reilly*